Will the clerk please call the next case? 5-16-02-16, Remediation v. Workers' Compensation Comm'n Counsel, you may proceed. Thank you, Your Honor. May it please the court? My name is James Clune. I represent Power Maintenance Constructors. Counsel? We are here because the Circuit Court of St. Clair County reversed the decision of the Workers' Compensation Comm'n and found in favor of the petitioner. The Workers' Compensation Comm'n had found in favor of the employer. The arbitrator below had found in favor of the petitioner. We are asking that you reverse the Circuit Court and reinstate the Commission's decision. I was listening to the arguments earlier today and I heard one of the participants was asked, Counsel, are you essentially here because the court substituted its opinion on the evidence with that of the Commission? In other words, just put their review of the evidence, reconsider all the evidence and put in what the Circuit Court thought the evidence was. And the answer this morning was yes and that's the same situation we have here. The background of the case, and I know you're familiar generally with what's going on here, but the decedent operated a, when he was working for Power Maintenance, operated a very large construction forklift. The claim is that during the time that he was operating this very large forklift, that he was positioned in the cab in such a way that the steering wheel of the forklift came in contact with his abdomen, eventually causing cellulitis, which ultimately resulted in sepsis, which, although the sepsis was never established by any medical examination, any testing, the suspicion was and everybody thought that he had sepsis. That in turn caused other parts of his body to fail and eventually die. There are two main issues here. One is accident, one is causal relationship. If you look at the accident issue and consider the testimony of John Bush, whose testimony was accepted by the Commission as being accurate and true, you will note that on each occasion that he saw Mr. Toone operating the lull, Mr. Toone was never in contact with the steering wheel. There is a witness that was presented by the widow, Meryl Hutch, who was a friend of the family and a co-worker, and he said every time I saw Mr. Toone operating the lull, his stomach was in contact with the steering wheel. Well, that wasn't all he presented. I mean, to be candid, I think it's fair to say there was some conflicting testimony. There was. You had Dr. Coley, who the Commission discounted, but nevertheless said that his stomach was in contact with the lull. With the steering wheel. You had the same thing with Dr. Bush was your witness. John Bush. So there was conflicting evidence. There was conflicting evidence, and the Commission chose to accept the findings, the statements and the evidence of John Bush. And I think... And why is that so compelling to exalt that over the other testimony? To exalt it over the testimony of Mr. Hutch? I think the key factor here is that unlike Mr. Hutch, John Bush said, look, I watched this guy, Mr. Toone, operate this lull all the time. And there were five other lulls operating at the same time. And he operated his with the same dexterity, the same nimble functioning, the same speed, the same accuracy as everybody else. And I'm sure you've seen the pictures in this thing, but if you take a look again at picture number eight, which is the picture that shows the steering wheel and the knob in question, you'll see that the knob, if you get very close to that steering wheel, can't go around. And so if you can imagine, what we used to call these things, they were called suicide knobs when I was a little kid. But the idea is that it's supposed to be a rapid way of turning the wheel. Now, if you're moving in the same manner, in the same speed, the same nimble agility as everybody else is moving, but your stomach is laying over the top of the steering wheel, which Dr. Coley said, his stomach was resting on the steering wheel. In order to make this happen, the stomach had to be resting on the steering wheel. You couldn't operate in the same fashion as everybody else. I mean, your argument has some intuitive appeal, but let me ask you this. Was there any testimony presented by the witnesses, expert or otherwise, that said you really couldn't efficiently operate it if that was happening? Was there any other testimony besides? Bush. Bush was the testimony. And he said what? Hodge did not rebut that when he was recalled to the stand. He didn't rebut that. Bush is the one that said it. And then there's the issue of, well, Bush took pictures and did videos to try to demonstrate to everybody what's involved in these things. And so we saw pictures and videos of how these things work. And you could see where the individual was moving that wheel around. If somebody's stomach was laying over the top of the wheel, it wouldn't work like that. And we know that it's not here in the umbilicus where the sore is. It's down below, down by the pubis bone, where the sore is located. And you can see that in the record. So what other reasonable inference could be drawn by what you just said? What are you suggesting? Although the respondent doesn't have to come up with another theory. He did come up with another understanding of what happened. What happened was, in the last months of his life, he gained a massive amount of weight due to what Dr. Schrantz said was congestive heart failure. But everybody agrees, he gained anywhere from 20 to 40 pounds. He wore the same clothing. His wife, his sister, John Bush, all said that his stomach, his belly, would hang over his pants, his jeans. He didn't change his jeans, but there's no evidence that he changed and went from a size XX or XXX to a size 4X. There's no evidence of that. He had the same clothing. So the theory is, and Dr. Coley agreed, Dr. Schrantz agreed, that if he had pressure from the beltline of his pants on the lower part of his abdomen, he would have compression sores. And that's where this may have come from. From the clothing rubbing against him? From the clothing, yes. From tight clothing, it's a compression sore. Dr. Coley said that in her testimony. And it's actually, it's in plaintiff's brief. Not only that she said that he rusted his stomach on the wheel, but also that she had a compression sore. So that's where this came from. If, in fact, we had to explain where the sore may have come from, that's where it came from. It came from hours and hours and hours of wearing tight clothing and sitting down. And both doctors agreed. And Dr. Coley said, look, if you can come up with another clinical explanation, I agree. This would not be work-related. And then I asked her, well, could it come from that? She said, yes, it could. So the case law that I cited in the brief basically goes to the proposition that the commission has the authority and the mandate to make credibility decisions, to select which factual evidence it's going to choose, which witness it's going to believe, and can even go behind an expert opinion and find out what the basis was for the expert opinion. And one of the things that the commission did was look at the hypothetical that was asked of Dr. Coley. Dr. Coley was asked to assume that this gentleman's stomach was in contact with the steering wheel. And then she made the statement, well, that's in my opinion, and that's what did it. But the commission was free to reject the statement by the decedent before he died and from Mr. Hutch and was free to accept what John Bush said, which was every time I saw this guy, not only was his stomach not in connection with that steering wheel, he operated that well in the same way that everybody else did. The same agility, the same speed, the same nimble activity that everybody else did. So you can't have it that the gentleman was so large that his stomach was literally laying over this thing and still have him working in the same fashion as everybody else. And they accepted John Bush, and they are allowed to accept John Bush. And if they accepted John Bush, then the hypothetical for Dr. Coley fails. Any other questions? I don't believe the court has any. Thank you. You'll have time in reply. Counsel may respond. Good afternoon. Your honors may please record. I am Edward Kiyanka, and I represent Petitioner Rebecca Toone. The response argument here at the beginning seems to be essentially that since the commission found a certain way, that's the end of the case. And whatever the circuit court did is beside the point. That cannot be true. As we said in the beginning of our brief, the Workers' Compensation Act, Section 19F1, states, provides for circuit court review. Review all questions of a law in fact presented by such record. But you are aware of the fact, however, we review the commission's decision.  Yes, your honors. But what I'm suggesting is the court should look at the circuit court's decisions analysis. When I first started on this case and I read the 21-page order of the circuit court, which of course is in the appendix, to the respondent's brief, my first thought was, how can I improve on this? At the end of its order, on page 28 of their appendix, the circuit court lists six findings in which it finds that the commission's majority decision, and it was a majority decision, two to one decision, is contrary to the manifest weight of the evidence. The circuit court was and is 100% correct. There are the commission's conclusion, majority of the commission's conclusion, is plainly erroneous. It's contrary to the manifest weight of the evidence, and it's based on incomplete and inaccurate selection of the evidence and speculation. I want to come back to the belt point. But of course, their theory is that it wasn't what the record overwhelmingly shows, that it was from contact with the Lulz steering wheel. It must have been from his belt. That's pure speculation. There's got to be some evidence. There would have to be some evidence, some medical evidence. We have medical evidence in support of the fact that it was the wheel. There's no medical evidence. There's no other. There's no circumstantial evidence. There's no evidence whatsoever that would say that this crescent shape, this horseshoe-shaped wound on his lower abdomen could be caused by a straight belt line. That's just... Well, you're absolutely correct, but that's sort of a red herring in a sense. That's a red herring. Because the burden of proof is always on the claimant. So you're right, maybe that seems speculative and it's hard to believe, but they don't even need to advance that. The question is whether or not the claimant established the case. What about the testimony of the supervisor that said, you can't operate this steering wheel if your stomach is hanging over it, and that's got some logical appeal. That's another red herring. Why is that? They keep saying it was resting or impacting the steering wheel. That was not the evidence. The evidence was that it rubbed the steering wheel. The arbitrator found that repetitive trauma from the rubbing of the steering wheel against the skin, and of course that wouldn't have had to be every second of the operation, just sometimes during the operation of the wheel, caused this wound, which then went into cellulitis, which went into sepsis, which ultimately led to his death. Who's Bush? Who's Mr. Bush? Yes, Bush was an employee of a company called Governa Construction. He was not an employee. He's the safety manager. He was the safety manager for the whole job. He's not working for the company, correct? But he was working. He was a subcontractor, so in that sense he was working for them. He testified he observed many instances the claimant operating the lull, and he said that it wasn't the case where it was rubbing against the steering wheel, correct? At least that's what Bush said. Yes, but how often did he observe that? There's nothing in the record to show that. When did his observations take place? How often did they take place? He testified that he was all over the job site. He wasn't in constant observation of Michael Toome. He was doing a lot of other things. In addition, as one of our witnesses, Merrill Hutch, testified, this was in the winter when this developed. He started working in September, but this wound developed apparently in the month before he was hospitalized. He was hospitalized on January 29th. So it would have been during the winter. During the winter, the door on the lull would have been closed, and you couldn't see, Hutch even testified he couldn't see if the seatbelt was even fastened, if the door was closed on the lull. So his testimony that he saw him operating it with space between the wheel and his abdomen is worth very little, very little progress. He couldn't see what now? What are you saying he couldn't see? If the door of the lull was closed, he couldn't see the lower part of the wheel. He couldn't even see whether the seatbelt was fastened. There was testimony he couldn't see if the seatbelt was fastened. So did that impeach Bush's testimony? It minimizes it. It minimizes it. He testified that he would occasionally, he had to check as part of his job to see if the operators were wearing a seatbelt, and he said that he did have checked on several, a number of occasions, and he saw that in those instances there was three to four inches between the seat, the stomach, and the steering wheel. He testified the lull was being operated in the same manner, same speed as any other vehicle. But when he's observing the steering wheel, the lull is not moving. You know, he's sitting there, he's talking to him, he comes up and talks to him, the door is open. We don't, there's not sufficient observation of him, of Mr. Toone, operating this lull eight or ten hours a day, five days a week, over time, for him to be able to say, therefore, it never contacted the wheel. Well, maybe you answered this. How does one operate the steering wheel, the mechanism, if your stomach is over the nap? How do you do that efficiently and effectively? How can you do that? Hutch testified that you can do this. I assume you turn it like this so that you're, you turn it, you said you operate it with your left hand, you shift it with the right hand, so you're turning it most of the time with the wheel on the upper quadrant. But it could still be rubbing against the wheel. And there's no impediment to operating it the same as everybody else. Correct, correct. But we have to look at the evidence as totality. There are five major categories of evidence here, and all five were overwhelmingly in favor of Petitioner. The first, of course, is the decedent's own statements. He told his doctor, who had been his doctor for several years, he told his doctor when he showed up at the hospital on January 29th, she asked him how did this happen, and he said it was caused by my stomach rubbing against the steering wheel. And he neglected it for a period of time. He didn't come in because he didn't think it was serious, whatever, until it got badly infected. So this is a statement for purposes of medical diagnosis and treatment. This is a hearsay exception. It's so reliable, we treat this as a hearsay exception. He had no reason to say anything that was not true when he's giving a report to her of how this happened. In addition, in the medical records, and we've cited all this in our brief, there are multiple places where this same statement appears to corroborate this. Now, did you say in this condition for several weeks before he went to the hospital? Well, it's unclear because he didn't complain. But the doctor, Dr. Coley in one place, indicates that he may have said that he had it for several weeks or a month. But it was just a redness earlier. It wasn't until the 28th, the day before he went to the hospital, that all of a sudden he experienced this great pain in his abdomen. And then when he was observed, there were red sores. And blood was coming out and so forth. It advanced at that point. But prior to that point, of course, it was developing. It hadn't reached that point until presumably that week. But in addition, when his co-worker, Merrill Hutch, visited him in the hospital, he asked him the same thing. How did this happen? He said, well, it was rubbing against my stomach. So we have multiply corroborating statements that that was the cause of it. Did the commission believe the statements regarding the cause of the sores? Didn't the commission have some problems with that and a credibility finding? Yes, Your Honor. What are we to do with that? In our brief at page 9, I probably don't have time today to go into all the detail. But beginning on page 9 of our brief, I have shown how the commission's attempt to discredit those statements is ineffective. They say, first of all, he didn't mention this prior to the hospitalization. Well, that doesn't mean anything. That would simply be a prior consistent statement. You know, a lot of men don't complain about these things. He might have not complained about it at work because he didn't want to be laid off or lose his job. There's any number. He probably thought it wasn't that serious until the very end when it became serious. So the fact that he hadn't complained before doesn't really mean anything in this context. Second, the commission says he didn't have skin abscesses on his abdomen in the last office visit. Well, that was back in September. Of course he didn't have skin abscesses back in September. This thing developed over time. And as Respondent says, over the last several months up to the time of his illness, he put on some 30 pounds. He weighed, according to the actual records, the hospital records, and, you know, they make you get on the scale, the records he weighed over 280 pounds at that time. The commission accepted the widow's generous estimate of his height, but the actual hospital records show that at the time of his hospitalization he was 5 feet 8 inches tall. He weighed 280-some pounds. Other witnesses testified that he was pear-shaped. He had skinny arms and legs and a huge, huge stomach. All of this corroborates the fact that as it developed up until the time he went into the hospital, this repetitive trauma with the steering wheel caused the wound. There is no other logical explanation. Yes, we have a burden of proof, but we met that burden of proof. We showed through multiple sources that this is what caused it. And all the respondent has in response to that is speculation. The evidence is, whether he complained earlier or not, though, it doesn't matter, because evidence has been disputed that on January 29th, when he went to the hospital, that wound was there, and he told his doctor that that was the cause of the wound. Another very important factor, as I mentioned, is the shape of the wound. It's horseshoe-shaped. Everybody testified that. The commission, in its order, admits that it was a crescent or horseshoe-shaped wound. What other explanation is there for a wound of that particular kind of description? It couldn't be anything else. It couldn't be his pants. He didn't wear a belt. Most of the time, he wore gym shorts, so that would not have caused a binding of his. Isn't there some testimony in the record somewhere, as I recall reading it, that his clothing, somebody opined that the clothing rubbing against his stomach could have caused the irritation? Didn't somebody testify to that? Your Honor, I think that refers to the only medical evidence the respondent had was this letter from Dr. Trance. And they tried to make a lot of that. I think the commission overstates what the letter actually says. Dr. Trance says that any of these things are possible. You know, it's possible they could have been clothing or something like that. He says, but Dr. Trance says, it seems more likely that the rubbing of the steering wheel would shape his abdomen repeatedly in order to cause the cellulitis from which he suffered. This is a plausible theory from a mechanism of injury standpoint. Okay. And your point is that, okay, the clothing aside, that the imprint on the abdomen, it being a horseshoe, reasonably could not have been clothing. It could only have been the steering wheel. It could only have been the steering wheel. There has to be some other evidence. We can't just speculate. That's the problem here with the commission's decision. There's so much speculation. Well, your burden was to establish it, and you say you have met your burden because the imprint on the abdomen matches that of the steering wheel. Is that the gist of it? Well, plus, we have his repeated statements to various people that it was caused by the rubbing of the steering wheel, and that's what the arbitrator found. You know, your honors, three of the five FECT deciders in this case who analyzed this record found that Petitioner approved her case, three of five. The arbitrator made that particular finding. I realize that the commission has to review that, but all that should be taken into account in looking at the manifest weight of the evidence. Counsel, your time is up. Thank you. Thank you, counsel. Thank you, Ron. Thank you. What more would the claimant have to do if there's that evidence? Are you talking about the horseshoe evidence? Horseshoe evidence in the statement by the decedent. Well, if every decedent's statement was accepted as being binding, then we wouldn't have death claims going up on appeal or going to trial. They would just be resolved. But the fact of the matter is I'm sure Mr. Toone was looking for anything to explain what may have happened to him. Just like if you walk on the sidewalk and you trip, you automatically look back to find out what happened because you want to try to figure out what happened. It doesn't mean that because he says it happened that way, it happened that way. In fact, Dr. Coley said, there's no scientific basis upon which I am relying to make this conclusion that you can get this from a steering wheel. I'm saying this because he told me and I was asked to give an opinion that you have to assume that he was in contact with the steering wheel. But you've got to understand when Coley testified, she testified that she assumed his belly was resting on the steering wheel. This is what we're talking about. If somebody is – this is a seat moved all the way up and this is the steering wheel at the umbilicus of Mr. Moss, one of the co-workers. The problem with Mr. Toon was way down here below. And counsel says – How far below? Where exactly was it? Well, there was one statement that it was at least six inches below the belly button or the umbilicus. There's another statement in – and I can get you the site, but it's in my brief – where there's an actual drawing in the hospital record and it's like page 300 of the St. Anthony record that the respondent put in. And it shows exactly where it was. And it was low. It was down in the pubis bone area, the pubic bone area, not up by the umbilicus. And I've got to tell you, I appreciate that the counsel is trying to say, well, how can you possibly get a – this kind of an abrasion from a pair of pants? Well, the fact of the matter is your hips are higher than your pubic area. And when people are large, when their belly is spilling over their pants, the pants are low and they're down in that area, exactly where both doctors said, yes, if he had tight pants, that could cause a – Compression shape? Compression injury. That's what bed sores are. There was contrary evidence in the record as to what caused that compression shape. The fact of the matter is there is evidence in this record, all over this record, to support what the commission did. And that's really the question we have here. Not whether the circuit court wanted to look at all this and re-weigh all this evidence. The question is, was there evidence in support of what the commission did? And there was absolutely evidence. Just accepting Bush alone, just by saying, you know what, I think Bush is right. I don't think he could have driven this thing the way everybody says he was driving, with having his belly over there. I think Bush was right that he was always away from that steering wheel. Just by taking that, everything else fails. You can take that by itself and say, every time – and did Bush watch him every day? I can't say that. But every time Bush saw him, every time he checked on his seatbelt, every time he drove by with the door open, because he'd been working there since July, every time he went up to see him, as of January 27th, when he went up to see him, he was away from that steering wheel. He had been back away, just like picture 11, only a little bit closer than that. Well, the problem with that picture is that you're assuming the exact same soma type of person in that picture as is in this scene. Well, what we have is Bush saying these guys were the same size. And we don't have anybody saying that – He did say that? There's testimony in the record they were the same size? Yes. As a matter of fact, there's this whole issue about, well, how tall was he? Was he 5'8"? Was he 6'2"? Bush is 6'2", and he said, the guy was a little shorter than me. His wife said he was 6'2". I've got to tell you, if you've been married for 35 years, your wife may not know your weight, but she'll know how tall you are. How did it become 5'7"? Because they're – I don't think he's standing on a scale, and they're measuring him when he's in extremis in the hospital. I think he was laying on a table, and they said, okay, you're 5'8", you weigh 280, your body habitus is this, your body mass index is this. That's all they cared about. His wife said 6'2"? His wife said 6'2". Bush says he's 6'2", and the guy was a little shorter than him. So, all right, I'm 5'8", and a 6'2"... And your wife thinks you're 6'5", right? So what does this height have to do with it? I'm sorry? What are we talking about the height for? Well, because there was some issue about, was he shorter and therefore fatter? But the fact of the matter is we don't have anything that talks about his girth other than Bush's observation, which was accepted by the commission. And there is no evidence that Bush wasn't in a position to make the observations he did. It's not like he was on vacation for three months. It's not like he couldn't see. The guy came by his safety facility all the time. So you're saying it's sufficient, if that's all the record contained, Bush's statement that he never saw his abdomen come in contact with the wheel would be sufficient? I would say it a little differently. Every time he saw him, his abdomen was not in contact with the steering wheel. But, yes, that's sufficient by itself. That piece of evidence by itself is sufficient for the commission to say, well, there was no contact here. We believe Bush over Hutch. And there's no reason why we can't believe Bush over Hutch, because that's our job. Counsel, your time is up. Thank you. Thank you, Counsel Bowles, for your arguments in this matter this afternoon. It will be taken under advisement that written disposition shall issue.